# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,

      Plaintiff,

vs.                                                                                       No. CIV 04-0997 JB/DJS

ESTATE OF ERIC TOLLARDO,
SAMUEL L. VALDEZ, ROSE
VALDEZ, AND PHOENIX INDEMNITY
INSURANCE COMPANY,

      Defendants.

Consolidated with

DAIRYLAND INSURANCE COMPANY,

      Plaintiff,

vs.                                                                                       No. CIV 04-1120 JB/DJS

RED EAGLE and/or STEPHANIE RAEL,
Individually and as Personal Representative
of the Estate of ALFREDO LITTLE
EAGLE RAEL, Deceased, JOHN DOE,
Personal Representative of the Estate of
ALFREDO LITTLE EAGLE RAEL,
Deceased, and JASON PEREA,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Plaintiff Dairyland Insurance Company's

Motion for Summary Judgment, filed April 26, 2005 (Doc. 25); and (ii) Defendant Rael's Motion for

Summary Judgment, filed September 19, 2005 (Doc. 50).  The primary issue is whether the parties

have demonstrated that there are no genuine issues of material fact whether Jason Perea used his automobile as an active accessory in the murder of Alfredo Little Eagle Rael, such that one party is entitled to judgment as a matter of law.   Because Plaintiff Dairyland Insurance Company ("Dairyland") has established that there are no genuine issues of material fact on this question and that it is entitled to judgment as a matter of law, the Court will grant Dairyland's motion and deny the Defendants' motion.

### FACTUAL BACKGROUND

On July 24, 2003, Jason Perea shot and killed Nathaniel Maestas, Rael, and Eric Tollardo. See Memorandum in Support of Motion for Summary Judgment ("Dairyland Summary Judgment Memorandum") at 4, filed April 26, 2005 (Doc. 26); Rael's Response to Dairyland's Motion for Summary Judgment ("Rael Response") at 11, filed September 12, 2005 (Doc. 49).  The murders occurring that night climaxed a drama unfolding over that summer between two main characters: Perea, a drug dealer in Taos, New Mexico; and Tollardo, a high ranking official in the Bario Small Town ("BST") gang.  See Deposition of Jason Perea at 6:25-8:5 (taken March 11, 2005)(hereinafter "Perea Depo."); Deposition of Charlie Martinez at 12:18-21 (taken March 9, 2005)(hereinafter "Martinez Depo.").

The chain of events leading up to the shooting began the week before with an encounter between Tollardo and Perea in Perea's apartment, in which Tollardo asked for "a $50 stash" of cocaine, but offered to pay Perea only $40 for it.  Perea Depo. at 6:12-19, 8:6-9.  When Perea refused, Tollardo angrily left.  See id. at 6:20-7:3.  Tollardo subsequently returned to Perea's apartment to tell him that "Emmett," a member of the Southern New Mexico prison gang, wanted 30% of Perea's drug profits.  See id. at 6:25-7:23.  Perea told Tollardo "I ride alone," an answer that

caused Tollardo to laugh and say "Whatever." Id. at 7:14-8:16. When Perea asked if Tollardo's response constituted a threat, Tollardo continued to laugh. See id. at 8:19-22.

Later, Perea received a phone call informing him that BST wanted to "jump" him and beat him up. Id. at 9:1-20. He left Taos, planning on going to Albuquerque to pick up drugs, but his car broke down. See id. at 9:18-22. His father picked him up, and the next day he went to Terra Maria to bail out a friend who had been arrested. See id. at 10:1-8. After staying the night at a friend's house, Perea turned on his phone and discovered that he had seven messages telling him that someone had burglarized his apartment. See id. at 10:8-14.

As Perea made his way back to Taos, Perea's brother, Bruce, and Tim Grant, Perea's neighbor, looked for the culprits. See id. at 23:24-24:1, 36:4-37:4. Arriving at the first house the duo had picked to search, Bruce and Tim found "Drowsy" (the owner of the house), Rael, "Bandit," Tollardo, and Tollardo's girlfriend, all five appearing to be stoned. See id. at 36:20-37:16. Tollardo pointed a gun at Bruce, and in response Bruce pulled out a gun and told Tollardo: "You shoot, I shoot." Id. at 37:17-24. Bruce and Tim thereafter left, and met up with Perea at Perea's apartment. See id. at 38:3-8. When Perea, Bruce, and Tim returned to Drowsy's house, they found no one. See id. at 38:14-18.

After spending approximately half of the remaining day looking for Tollardo and the others, Perea came across Drowsy and Rael in a Camry. See id. at 11:6-12:2. Perea believed that these two were involved in the burglary. See id. at 12:3-6. Apparently wishing to disassociate themselves from the burglary, they gave Perea a gun and a laptop computer. See id. at 12:14-17. Perea told them to bring Tollardo to him within a week. See id. at 12:20-22.

On the night of July 24, 2003, Perea looked out the window of his apartment and saw a

number of men getting out of two cars and going up the stairs to his apartment.  <u>See</u> <u>id.</u> at 13:2-6.

Tollardo appeared at his door, telling Perea that he needed to talk to him.  <u>See</u> <u>id.</u> at 13:8-14.  Perea

opened the door and allowed Tollardo, along with Maestas, Rael, Drowsy, "Scrappy," and another

unidentified person, into the apartment.  <u>See</u> <u>id.</u> at 13:16-20.  After closing the door, Perea turned

around and saw Tollardo pointing a gun in his face.  <u>See</u> <u>id.</u> at 13:25-14:1.  Perea and Tollardo then

got into an argument.  <u>See</u> <u>id.</u> at 14:18-19.  Tollardo finally left the apartment, saying:  "Well, I'll be

back, punk."  <u>Id.</u> at 15:2-3.

  Initially, Perea decided to go to Albuquerque following this latest installment in the

confrontation between Tollardo and him.  <u>See</u> <u>id.</u> at 15:13-14.  Perea changed his mind ten or twenty

minutes later when Tollardo's statement, that he would be back, "hit" Perea.  <u>Id.</u> at 15:15-17.  Perea

then picked up two Glock pistols and went looking for Tollardo.  <u>See</u> <u>id.</u> at 15:18-19, 18:19-24.

  Perea drove around Taos in his uninsured 1992 Silverado truck for two or three hours,

looking for Tollardo.  <u>See</u> <u>id.</u> at 16:5-11, 49:8-11.  Perea eventually gave up and decided to return

to his apartment, driving at a high velocity to get home quickly.  <u>See</u> <u>id.</u> at 16:19-20, 53:10-12.

  By chance, Perea spotted, on his way home, a blue car at a Mustang gas station.  <u>See</u> <u>id.</u> at

15:22-25, 54:2-9.  Perea recognized the car as one of those he had seen parked in front of his

apartment earlier in the day just before his confrontation with Tollardo.  <u>See</u> <u>id.</u> at 45:6-13, 54:2-9.

Surprised to see the blue car again, Perea suddenly applied his brakes, but missed the two entrances

into the gas station.  <u>See</u> <u>id.</u> at 16:12-24.  His truck then jumped over a curb and "slammed into a

pole."  <u>Id.</u> at 16:22-24.  At this point, Perea's truck was "clear across the parking lot" from the blue

car.  <u>Id.</u> at 26:23-27:5.

  Perea thereafter got out of his truck and ran toward the blue car, with a loaded gun in each

hand.  See id. at 16:25-17:3, 27:6-9, 46:1-3.  Perea ran until he reached the gas pumps, and then

began to walk.  See id. at 27:6-9.  Perea intended "to pull [Tollardo] out [of the blue car] and just

beat the shit out of him," not kill him.  Id. at 17:15-19.

Perea was about two and a half car lengths from Tollardo when, he asserts, he heard a girl's

voice say, "Oh shit," followed by a pop.  Id. at 16:25-17:3, 27:10-20.  Perea maintains that he

believed the pop came from a gunshot, and consequently he began firing his guns at the blue car.  See

id. at 16:25-17:3, 17:21-25, 27:10-20.  Perea alleges that Tollardo shot at him twice.  See id. at 18:7-

16.  Perea ran up to the car, firing into the driver's side window because Tollardo was sitting in the

driver's side seat.  See id. at 47:4-11.  Perea stated in his deposition that he was only trying to shoot

Tollardo, but that the three other passengers caught stray bullets.  See id. at 47:15-19.

After he ran out of ammunition, Perea ran back to his truck and left the scene.  See id. at

49:12-18, 50:23-24.  The police stopped him and his father later that night.  See Martinez Depo. at

19:1-8.  Perea confessed to the shooting while the police questioned him.  See id.

Besides Tollardo, there were three other people in the car.  Rael sat behind Tollardo, and

Maestas sat to Rael's right.  See id. at 5:16-6:3.  A young woman was sitting in the front passenger

seat.  See Perea Depo. at 47:20-48:4.  Tollardo, Rael, and Maestas died from the gunshot wounds

that they suffered.  See Martinez Depo. at 5:16-6:6.  Perea pled guilty to first degree murder for the

deaths of Rael and Maestas, and second degree murder for the death of Tollardo.  See Rael's

Memorandum in Support of Motion for Summary Judgment ("Rael Summary Judgment

Memorandum") at 7, filed September 19, 2005 (Doc. 51).

The car in which these three people died is a 1992 Ford Taurus, which Rael's mother,

Stephanie Rael, owned.  See Deposition of Stephanie Rael at 8:3-5, 27:24-28:1 (taken August 18,

2005)(hereinafter "Rael Depo."); Rael Summary Judgment Memorandum at 3.  The Raels also owned

a 1997 Chevy Pickup, a 1993 Buick Regal, and a 1995 Ford Explorer.  See Rael Depo. at 28:24-29:3;

Rael Summary Judgment Memorandum at 3.  Dairyland Policy #NM294208317, issued to Stephanie

Rael, insured the Taurus and the Chevy truck.  See Rael Summary Judgment Memorandum at 3;

Memorandum in Response to the Rael Defendants' Motion for Summary Judgment at 2, filed

October 6, 2005 (Doc. 58).  Dairyland Policy #NM294155872, also issued to Stephanie Rael, insured

the Buick and the Explorer.  See Rael Summary Judgment Memorandum at 3; Memorandum in

Response to the Rael Defendants' Motion for Summary Judgment at 2.  Both policies include

uninsured motorist coverage, whereby Dairyland promises

> to pay damages, excluding punitive or exemplary damages, the owner or operator of
> an uninsured motor vehicle is legally obligated to pay because of a bodily injured you
> suffer in a car accident while occupying a car or, as a pedestrian, as a result of having
> been struck by an uninsured motor vehicle.

Plain Talk Car Policy at 8 (emphases omitted).  A car accident is defined as "an unexpected and

unintended event that causes bodily injury or property damage and arises out of the ownership,

maintenance, or use of a car or other motor vehicle."  Id. at Definitions.

## PROCEDURAL BACKGROUND

On October 1, 2004, Dairyland filed a Complaint for declaratory relief, asking the Court to

declare that the uninsured motorist provision of the insurance policy issued to Stephanie Rael does

not apply to Rael's death.  See Complaint at 4, filed October 1, 2004 (Doc. 1 in 04cv1120).[1]

Dairyland also requested that the Court find that its denial of coverage was not in bad faith and did

not violate New Mexico law.  See id.  The Court consolidated this case with Hartford Insurance

---

[1] Unless otherwise stated, all document numbers refer to documents filed in the consolidated
matter (Case No. 04cv997).

Company of the Midwest v. Estate of Eric Tollardo, No. 04cv997 (D.N.M.), on January 27, 2005 upon motion of all the parties.  See Order of Consolidation at 1, filed January 27, 2005 (Doc. 10 in 04cv1120).

On April 26, 2005, Dairyland filed a motion for summary judgment.  Dairyland argues that the uninsured motorist provision is inapplicable because Rael's death did not arise out of the use of an uninsured motor vehicle under the three-part test that the Supreme Court of New Mexico established in Britt v. Phoenix Indem. Ins. Co., 120 N.M. 813, 907 P.2d 994 (1995).  See Dairyland Summary Judgment Memorandum at 7-13.  Perea's truck was not an active accessory to Rael's death because Perea used his truck merely to travel to the scene of the crime, rather than employing it to gain an advantage over his victims before attacking them.  See id. at 11-12.  Perea had given up looking for the blue car when he spotted it at the gas station.  See id.  Perea also stopped his car across from the gas station parking lot instead of pulling up beside the victims.  See id. at 12.  According to Dairyland, the only link between Perea's vehicle and the crime is that "Perea occupied the truck prior to the shooting and left in his truck."  Id.  Dairyland asserts that an uninsured motorist's presence in his vehicle is not sufficient to establish the vehicle as an active accessory to another person's injuries.  See id. at 12-13.

Dairyland also maintains that the shots allegedly fired from the Raels' car broke any causal link between the use of Perea's truck and the deaths of the three men.  See id. at 13-14.  Finally, Dairyland believes that the victims' deaths were not the result of an accident because their own actions in allegedly shooting at Perea provoked Perea to fire back at them.  See id. at 14-16.

The Defendants Red Eagle Rael and Stephanie Rael responded on September 12, 2005.  The Defendants admitted that the Britt test applied to this case.  See Rael Response at 14.  The

-7-

Defendants contend that Perea used his truck as an active accessory because he drove it for three hours looking for the victims. See id. at 15. Perea also used the truck to transport his guns and arrive at the gas station, where he killed the victims. See id. at 15-16. The Defendants also dispute Perea's credibility by pointing out that he is a convicted murderer. See id. at 16.

As for the act of independent significance factor, the second part of the Britt test, the Defendants point out that no one, except Perea, saw shots coming from the blue car, casting doubt on whether there was an act of independent significance to break the causal connection between the use of Perea's truck and the shootings. See id. at 17. Furthermore, Perea stated that he intended the whole time to inflict bodily injury on Tollardo. See id. Finally, the Defendants assert that Rael did not provoke his own death because he had nothing to do with Tollardo and Perea's blood feud. See id. at 17-18.

On September 26, 2005, Dairyland filed a reply in support of its motion for summary judgment. Dairyland argues that no New Mexico case establishes that mere use of a vehicle qualifies a vehicle as an active accessory. See Reply in Support of Motion for Summary Judgment ("Reply") at 6, filed September 26, 2005 (Doc. 55). In prior cases, according to Dairyland, vehicles were used to precipitate a violent confrontation, to complete a drive-by shooting, or to rapidly escape from the scene of a crime. See id. Without more than Perea's use of the truck solely to transport himself to the scene of the assault, the Defendants assert, the truck is not an active accessory. See id.

In addition, Dairyland highlights the truck's collision with a pole and Perea's removal from his vehicle before starting to fire as acts of independent significance. See id. at 7-9. Furthermore, Dairyland argues that there is no dispute that Tollardo and Rael instigated the shooting by going to Perea's apartment earlier that night, with Tollardo pointing a gun at Perea and threatening to return.

See id. at 10.  As for Perea's credibility, Dairyland finds no inconsistency in Perea's description of Rael at one point as bald, when Rael had hair, because Rael had very short hair.  See id.  In any event, Dairyland asserts that Perea has no motive to lie because he is already in prison.  See id.

The Defendants filed their own motion for summary judgment on September 19, 2005.  The Defendants raise the following facts to show that Perea's truck was an active accessory: Perea used the truck to carry himself and his weapons to the gas station; Perea used the truck to look for the victims; Perea used the truck to escape from the gas station; Perea's plea to first degree murder shows he had intended to harm the victims throughout the night, even though Perea testified that he gave up the search for the victims before finding them.  See Rael's Memorandum in Support of Motion for Summary Judgment ("Rael Summary Judgment Memorandum") at 14, filed September 19, 2005 (Doc. 51).  The Defendants also maintain that a gunshot emanating from the blue car did not constitute an act of independent significance because a witness denied ever seeing a gunshot, Perea did not rely on any self-defense argument in his criminal case, and Perea left his truck intending to initiate an armed confrontation with Tollardo regardless whether Perea was attacked first.  See id. at 11, 14-15.  Moreover, the Defendants argue that Rael had nothing to do with the dispute between Tollardo and Perea, negating the idea that he had a hand in provoking his own death.  See id. at 16. Finally, the Defendants assert that they are entitled to stack coverage.  See id. at 19-23.

Dairyland responds by pointing out that Perea's use of his truck was incidental to the shooting because he could have used another means of transportation, including bicycling or walking, to the blue car.  See Memorandum in Response to the Rael Defendants' Motion for Summary Judgment ("Dairyland Response") at 9, filed October 6, 2005 (Doc. 58).  Dairyland contrasts this case with a car chase or drive by shooting, which would qualify as the use of a vehicle as an active accessory.

See id. at 10.  Dairyland further contends that Perea disassociated himself from the truck before he killed the victims by slamming the truck into a pole, leaving the truck, and crossing a parking lot before committing his crime.  See id. at 12-13.  Dairyland concludes that it is not reasonable to believe that Rael and Tollardo did not expect Perea to react violently to the threats which Tollardo made against him.  See id. at 13.  Finally, Dairyland denies that the Defendants are entitled to stacking.  See id. at 14-17.

In their reply, the Defendants assert that Rael was not involved in the burglary of Perea's apartment and that Perea made up the story about Rael after failing to mention him in his initial police interviews.  See Rael's Reply Brief in Support of Their Motion for Summary Judgment ("Rael Reply") at 6-7, filed October 21, 2005 (Doc. 61).  The Defendants contend that Perea does has a motive to lie because Perea might have created this story about Rael to support a petition for a writ of habeas corpus.  See id. at 8.

The Court held a hearing on these motions on October 27, 2005.  Dairyland acknowledged that there is a genuine issue of material fact over who fired the first shots: Perea or the occupants of the blue car.  See Transcript of Hearing at 12:6-12 (taken October 27, 2005).[2]  Dairyland explained that its synthesis of cases from the New Mexico state courts and the United States Court of Appeals for the Tenth Circuit led it to conclude that a vehicle is an active accessory when it is an integral part of a preplanned event, such as using it to: block the exit of the victims; hide the attacker's identity; surreptitiously approach the victims; or conceal the attacker's weapons.  See id. at 20:6-22:10.  Perea, Dairyland argued, did none of these things.  See id.  Instead, Perea had given up the search,

---

[2] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any finalized transcript may contain slightly different page and/or line numbers.

crashed the truck, and then exited the vehicle before killing the victims.  See id.  Dairyland affirmed

that Perea only used the truck for transportation.  See id.  Dairyland also noted that Perea's plea is

not collateral estoppel or res judicata in this action because Dairyland was not a party to the prior

criminal action.  See id. at 33:10-17.  Dairyland further asserted that the Court could consider cases

in which New Mexico courts determined that a driver participated in an attack on another because

that issue is related to whether there is a causal nexus.  See id. at 34:23-35:18.

The Defendants stressed the remedial nature of New Mexico law regarding uninsured motorist

coverage.  See id. at 25:7-14.  The Defendants emphasized that Perea used the car to search for the

victims for several hours, drove in a "fast manner to the scene of the crime," and used the vehicle to

escape.  Id. at 26:5-12, 29:15-19.  The Defendants distinguished Farmers Insurance Company v.

Sedillo, 129 N.M. 674, 11 P.3d 1236 (2000), where a fight broke out at a tailgate party as a result

of one person's reckless driving, from this case by highlighting that the confrontation in Sedillo truly

began only when all of the participants were outside of their vehicles.  See Transcript of Hearing at

27:9-28:13.  The Defendants also dispute that Perea ever gave up the search.  See id. at 29:18-20.

The Defendants agreed that there are no genuine issues of material fact precluding the Court from

deciding whether Perea's truck was an active accessory to the accident and that the Court should

decide this factor.  See id. at 30:16-22.

## LAW REGARDING UNINSURED MOTORIST COVERAGE

The Supreme Court of New Mexico has adopted a three-part test to determine if a motorist's

injuries, resulting from an intentional tort, arise out of the ownership, maintenance, or use of an

uninsured vehicle, thus qualifying for coverage under an uninsured motorist policy.  See Britt v.

Phoenix Indem. Ins. Co., 120 N.M. at 818-819, 907 P.2d at 999-1000 (adopting a three-part test

articulated by the supreme courts of Colorado and Minnesota); <u>State Farm Mut. Auto. Ins. Co. v.</u>
<u>Blystra</u>, 86 F.3d 1007, 1011 (10th Cir. 1996) (recognizing that <u>Britt</u> embraced a three-part test for
deciding uninsured motorist coverage issues)(citation omitted).  <u>Britt</u> teaches that "a court first
considers whether there is a sufficient causal nexus between the use of the uninsured vehicle and the
resulting harm." <u>Britt v. Phoenix Indem. Ins. Co.</u>, 120 N.M. at 818, 907 P.2d at 999.  The first factor
is satisfied if the vehicle was an "active accessory in causing the injury." <u>Id.</u> (internal quotations and
citations omitted).

"If a court finds that there is a sufficient causal nexus, then it should next consider whether
an act of independent significance broke the causal link between the use of the vehicle and the harm
suffered." <u>Id.</u> at 819, 907 P.2d at 1000 (citations omitted).  "Finally, the court must consider whether
the 'use' to which the vehicle was put was a normal use of that vehicle." <u>Id.</u>  An example of a normal
use is transportation, but not using "a parked car for a gun rest." <u>Id.</u> (citation omitted).

### STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.
P. 56(c). <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The opposing party may not
rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that
there is a genuine issue for trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986)(citing Fed. R. Civ. P. 56(e)).  An issue of fact is "genuine" if the evidence is significantly
probative or more than merely colorable such that a jury could reasonably return a verdict for the
non-moving party.  <u>See id.</u> at 249-50 (citations omitted).  Mere assertions or conjecture as to factual

-12-

disputes are not enough to survive summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).  The Court may only consider admissible evidence when ruling on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## ANALYSIS

The Court finds that there is not a causal nexus between Perea's use of his truck and the shooting deaths of the three victims because his truck was not an active accessory to his crimes. Because all three elements of the Britt test must be satisfied for an intentional tort to arise from the ownership, maintenance, or use of an uninsured vehicle, the Court concludes that the Defendants' uninsured motorist policy does not cover Rael's and Tollardo's deaths.

The parties agree that, for the Defendants to recover under the uninsured motorist policy, Rael's injuries must have arisen from the ownership, maintenance, or use of an uninsured vehicle. See Dairyland Summary Judgment Memorandum at 6; Rael Response at 14.  The parties further admit that the Britt test controls whether Rael's death arose from the ownership, maintenance, or use of an uninsured vehicle.  See Dairyland Summary Judgment Memorandum at 6-7; Rael Response at 14-15.  The first prong of the Britt test requires a causal nexus between Perea's use of his truck and the resulting harm to Rael, specifically his violent death.  See Britt v. Phoenix Indem. Ins. Co., 120 N.M. at 818, 907 P.2d at 999.  The truck must have been an active accessory in Rael's death.  See id.  The Defendants conceded that there were no genuine issues of material fact on the first prong that would prevent the Court from deciding whether there was a causal nexus.  See Transcript of Hearing at 30:16-22.

Several undisputed facts indicate that Perea's truck was not an active accessory to Rael's

-13-

death.  First, before spotting the blue car in the gas station, Perea had ceased using his truck to search

for Rael and the others.  See Perea Depo. at 16:19-20, 53:10-12.  As he approached the gas station,

he was using his truck for the sole purpose of going home, and not to look for Tollardo and his

associates, because he had given up his quest for revenge.  See id.  Perea was not employing his truck

for anything as dramatic as murder, but for something much more prosaic: returning to his apartment.

See id.  As a result, when Perea initiated his assault on the blue car, he was not using his car to assist

any plot against the occupants of the blue car.

        The Defendants attempt to controvert this conclusion by highlighting a videotaped confession,

made by Perea on the night of the murders and attached to the Defendants' Response brief,[3] in which

he allegedly stated that he had not stopped looking for Tollardo and the others before passing the gas

station.  See Rael Response at 12.  As an initial matter, the Court notes that the Defendants fail to

point out at what point Perea supposedly made this statement during the nearly two hour long

interview, citing only to "Exhibit 6, Videotaped confession of Jason Perea on the night of the

murders."  Id.  The Court, however, reviewed the entire tape.  At 5:15 a.m., according to the time

on the videotape, Perea told the police that he was heading home when he spotted the blue car at the

gas station.  See Videotape of Police Interview with Jason Perea.  Far from contradicting Dairyland's

assertion that Perea had given up the search for the victims before driving by the Mustang Gas

station, the videotape actually bolsters Dairyland's argument and fails to create a genuine issue on

this point.

_____

        [3] Dairyland states in its Reply that the videotape was not attached to the copy of the Response
it received.  See Dairyland Reply at 3.  The Court, however, received a copy of the videotape.
Because the Court concludes that the videotape does not create a genuine issue, the Court need not
consider the consequences of Dairyland not receiving the exhibit.

In the alternative, the Defendants argue that the Court should accept Perea's guilty plea to first degree murder as evidence that he intended, throughout the night, to kill the victims. Rael Summary Judgment Memorandum at 14. Collateral estoppel, however, requires "that the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication." Harrison v. Eddy Potash, Inc., 248 F.3d 1014, 1022 (10th Cir. 2001)(internal quotations and citations omitted). Dairyland was clearly not a party to the prosecution of Perea, nor was it in privity with Perea or the United States. The Court will thus not apply collateral estoppel to this case.

Second, Perea was unable to use the truck as an active accessory to the murders because he missed the two entrances into the gas station and slammed his truck into a pole before initiating his assault on the blue car. See Perea Depo. at 16:12-24. These facts indicate that the truck, far from aiding Perea launch his attack, actually hindered his efforts. The truck's high velocity prevented him from entering the gas station and exploiting the element of surprise. Similarly, the truck's crash left Perea unable to use the truck to reclaim any advantage that its speed would have given him. Indeed, the truck's usefulness in staging the gun battle effectively ended with the crash because Perea still had to cross the parking lot on foot to reach the blue car.

It is true, as the Defendants contend, that Perea used the truck to escape from the gas station after killing the victims. See id. at 49:12-18, 50:23-24. The Defendants do not cite a case, however, which establishes that using a vehicle merely to escape qualifies as an active accessory. While neither the New Mexico courts nor the Tenth Circuit have foreclosed the possibility that operating a vehicle as a method of escape qualifies that automobile as an active accessory, New Mexico adopted the Britt test from the three-part test used in Minnesota. See Britt v. Phoenix Indem. Ins. Co., 120 N.M. at

818-19, 907 P.2d at 999-1000 (describing the Minnesota test and applying it to the facts of the case). Given that New Mexico found Minnesota law on uninsured motorist coverage so persuasive in Britt, New Mexico would likely find Minnesota cases interpreting the three-part test to be persuasive as well.

The Minnesota courts have ruled out the mere use of a vehicle for transportation to the scene of a crime as satisfying the active accessory requirement. See Edwards v. State Farm Mut. Auto. Ins. Co., 399 N.W.2d 95, 98 (Minn. Ct. App. 1986)(finding the fact that the uninsured attacker used an automobile for transportation to the scene of a rape and murder insufficient to qualify the vehicle as an active accessory). Other, unpublished Minnesota cases have reiterated this principle. See Kohn v. Ross, 1998 Minn. App. LEXIS 372 at *6-7 (Ct. App. 1998)(reasoning that the car at issue "was not an active accessory to [the victim's] injury nor was the operation of the car for transportation purposes causally related to [the victim's] injury" because "[t]he car served only to transport [the assailants] to the scene of the incident"); Gibbons v. Crum & Forster Commercial Ins., 1992 Minn. App. LEXIS 1125 at *5-6 (Ct. App. 1992)(deciding that a taxicab was not an active accessory because "[t]he cab served merely to transport [the victim and the assailant] to the situs of the injury, rather than to assist the [assailant] in assaulting [the victim]").

The Court believes that New Mexico would find this line of reasoning persuasive on the issue whether mere use of a vehicle to escape meets the active accessory requirement. First, New Mexico adopted its test verbatim from Minnesota, thus indicating that New Mexico finds Minnesota law in this field to be persuasive to a certain degree. Second, the Court sees no reason why transportation away from, but not to, the scene of a crime should render the vehicle an active accessory. There is even less of a causal connection between the former use of an automobile and an injury for the simple

reason that the injury would occur before the use of the vehicle to escape.  Furthermore, two of the

advantages identified by the Tenth Circuit that make use of an automobile as an active accessory

attractive to assailants -- stealth pursuit of the victim and concealment of one's identity -- do not

come into play when a vehicle is only used to escape.  See State Farm Mut. Auto. Ins. Co. v. Blystra,

86 F.3d at 1012.

       Even if the Court accepted the Defendants' argument, that employing a vehicle as a means

of escape makes it more likely that it was an active accessory, the Court notes that this case still lacks

certain features that have led New Mexico courts and the Tenth Circuit in other cases to conclude

that an automobile was an active accessory.  For example, in Blystra, the Tenth Circuit determined

that using a truck to commit a drive-by shooting made the truck "almost by definition an 'active

accessory' to the assault" because of three advantages such a tactic gives the assailant:

> First, the assailant can use the vehicle to unsuspiciously and quickly approach his
> victim, all the while hiding from public observation that he is armed with a gun.
> Second, during the commission of the assault, the assailant can use the vehicle to help
> hide his identity. Third, the assailant can use the vehicle to leave the scene quickly and
> avoid apprehension.

State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d at 1012.  In Barncastle v. Am. Nat'l Prop. & Cas.

Cos., 129 N.M. 672, 11 P.3d 1234 (Ct. App. 2000), the New Mexico Court of Appeals concluded

that a passenger used a vehicle as an active accessory when he or she got out of the automobile,

walked over to the victim's Toyota (which was stopped at an intersection), shot the victim, and

returned to the original vehicle, which sped away.  See id. at 673-74, 11 P.3d at 1235-36.  The

Barncastle vehicle was an active accessory because "[t]he driver of that vehicle used it to get into a

position where [the] Assailant could get out and shoot" the victim, and then escaped from the scene

at a high velocity in it, rendering the automobile "'an integral element of the shooting.'"  Id. at 674,

-17-

11 P.3d at 1236 (quoting State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d at 1014).

This case's facts are distinguishable from those of Blystra and Barncastle. First, Perea did not use the truck to commit a drive-by shooting because he shot the victims while on foot and outside of the truck. See Perea Depo. at 16:25-17:3. As such, Perea did not accrue to himself the advantages of a drive-by shooting, as the attacker in Blystra did. Perea did not use the vehicle to unsuspiciously and quickly approach the victims, while hiding from public view that he was armed, because he traversed the last part of his journey on foot across a parking lot in sight of those in the gas station, as evidenced by the fact that someone said "Oh, shit" as he neared the blue car, and he held a gun in each hand. Id. at 16:25-17:3, 46:1-3. See also State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d at 1012. In fact, Perea was at least still two and a half car lengths from the victims when he left his truck. See Perea Depo. at 27:10-20. If anything, Perea's use of his truck only made it more likely that his victims would detect him because he crashed the truck into a pole at a high rate of speed. See id. at 16:22-24.

Furthermore, Perea did not use the truck to hide his identity, and thus gain the second Blystra advantage, because the truck was parked across the parking lot when Perea began shooting into the blue car. See id. at 26:23-27:5; State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d at 1012. Perea received only the third Blystra advantage, using the truck to escape at a high velocity, while failing to achieve the other two advantages. See Perea Depo. at 49:12-18; State Farm Mut. Auto. Ins. Co. v. Blystra, 86 F.3d at 1012.

Comparing this case to Barncastle, the Court notes that Perea did not use the truck to get into a position where he could get out and shoot the victims. See Barncastle v. Am. Nat'l Prop. & Cas. Cos., 129 N.M. at 674, 11 P.3d at 1236. Unlike the killer's vehicle in Barncastle, which pulled up

-18-

right alongside the victim's car to give the attacker a clear shot, Perea careened the truck into a pole across the parking lot from his victims, far enough away that he was more than two and a half car lengths from the victims when the truck stopped.  <u>See</u> Perea Depo. at 16:22-24, 26:23-27:5, 27:10-20; <u>Barncastle v. Am. Nat'l Prop. & Cas. Cos.</u>, 129 N.M. at 673, 11 P.3d at 1235.  The only resemblance this case has to <u>Barncastle</u> is that Perea used the truck to escape.  <u>See</u> Perea Depo. at 49:12-18; <u>Barncastle v. Am. Nat'l Prop. & Cas. Cos.</u>, 129 N.M. at 674, 11 P.3d at 1236.

While this case shares with <u>Blystra</u> and <u>Barncastle</u> the use of the vehicle to escape from the crime, this matter lacks other features of those cases that made each of those automobiles an active accessory.  Perea did not use the truck to engage in a lightning strike against the victims, as the drive-by shooter in <u>Blystra</u> did, nor did he maneuver the truck so as to appear beside the victims without warning, as the <u>Barncastle</u> assailant did.  Without these additional aspects, the Defendants' contention that using a vehicle to escape meets the active accessory requirement weakens considerably.

Indeed, this case does not possess facts similar to those in other cases that, even though the New Mexico courts found such facts to be insufficient to establish the active accessory prong, would have strengthened the Defendants' argument that Perea's truck was an active accessory.  In <u>Farmers Ins. Co. v. Sedillo</u>, 129 N.M. 674, 11 P.3d 1236 (Ct. App. 2000), a pickup truck drove very close to the insured's daughter, precipitating a confrontation that led to the Defendant's injuries.  <u>See</u> <u>id.</u> at 675, 11 P.3d at 1237.  The New Mexico Court of Appeals found that the truck's instigation of the physical violence did not render it an active accessory to the attack on the Defendant.  <u>See</u> <u>id.</u> at 676, 11 P.3d at 1238.  Neither party argues in this case that Perea's truck was used to foment the bloodshed at the gas station.  Instead, the evidence shows that the events leading to the deaths in the blue car mainly involved the confrontations, and burglary, in Perea's <u>apartment</u>, not his truck.  <u>See</u>

Perea Depo. at 6:12-8:22, 10:8-14, 13:2-15:3.

Finally, the Court notes the absence of facts in this case that might make it more likely that Perea's truck was an active accessory.  For example, Perea did not use the truck to prevent the blue car from escaping, such as by ramming it or blocking the blue car's path out of the gas station. Instead, Perea rammed a pole and left the truck across the parking lot from the blue car.  See id. at 16:22-24, 26:23-27:5.  Perea did not use the truck as a weapon itself, by running over the victims or colliding with the blue car, because he killed them with guns.  See id. at 16:25-17:3.  The Court is not saying that New Mexico law would find any of these activities to fall under Britt's ambit.  The Court, however, makes these observations to highlight what would have strengthened the Defendants' case and why their arguments lack persuasive force.

In sum, the undisputed facts of this case show that Perea did not use his truck as an active accessory.  Because the first prong of the Britt test has failed, the Court cannot find that the victims' injuries arose out of the ownership, maintenance, or use of an uninsured vehicle, and need not examine the other two parts of the Britt test.  See Britt v. Phoenix Indem. Ins. Co., 120 N.M. at 819, 907 P.2d at 1000 (indicating that a court should only go on to the second and third Britt prongs if the active accessory requirement has been met).  The Court will therefore grant Dairyland's motion for summary judgment and deny the Defendants' motion for summary judgment.

**IT IS ORDERED** that Plaintiff Dairyland Insurance Company's Motion for Summary Judgment is granted and Defendant Rael's Motion for Summary Judgment is denied.  The Court declares that the Dairyland uninsured motorist policies issued to Stephanie Rael do not cover the deaths of Eric Tollardo and Alfredo Little Eagle Rael.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Rudolph A. Lucero
Miller Stratvert, P.A.
Albuquerque, New Mexico

   *Attorney for Plaintiff/Defendant/Cross-defendant/Cross-claimant Dairyland Insurance Company.*

Larry D. Beall
Kelley J Friedman
Beall & Biehler
Albuquerque, New Mexico

   *Attorney for Plaintiff/Counter-defendant Hartford Insurance Company of the Midwest*

Chris Lucero Jr.
Albuquerque, New Mexico

   *Attorney for Defendant Red Eagle Rael*

Bruce S. McDonald
Law Offices of Bruce S. McDonald,
Albuquerque, New Mexico

-- and --

Kevin A. Zangara
Taos, New Mexico

   *Attorneys for Defendant/Counter-claimant/Cross-claimant/Cross-defendant Estate of Eric Tollardo, Defendant/Counter-claimant/Cross-claimant/Cross-defendant Samuel L. Valdez, Defendant/Counter-claimant/Cross-claimant/Cross-defendant Rose Valdez*